991 So.2d 1155 (2008)
Harry MENDOZA
v.
DEPARTMENT OF POLICE.
No. 2008-CA-0062.
Court of Appeal of Louisiana, Fourth Circuit.
August 20, 2008.
*1156 Eric J. Hessler, Meridian, MS, for Plaintiff/Appellee.
Penya Moses-Fields, City Attorney, Joseph V. DiRosa, Jr., Chief Deputy City Attorney, Heather M. Valliant, Assistant City Attorney, James B. Mullaly, Assistant City Attorney, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
The New Orleans Police Department ("NOPD") appeals a decision by the Civil *1157 Service Commission of the City of New Orleans ("CSC"), which set aside the discipline imposed by the NOPD on the appellee, Harry Mendoza ("Mendoza"). We affirm.
Mendoza was employed by the NOPD as a police captain. The NOPD demoted Mendoza to the rank of lieutenant and then terminated his employment by letter dated 28 July 2006. As reflected in the disciplinary letter, the NOPD found that Mendoza's conduct violated the NOPD's internal rule regarding "Devoting Entire Time to Duty."
Mendoza appealed his termination. The matter was assigned by the CSC to a hearing examiner and hearings were held on 9-10 January 2007 and 12 February 2007. The hearing examiner issued his report on 23 May 2007, which recommended that the appeal be granted. The case was then reviewed by the CSC, which granted the appeal and ordered that Mendoza be reinstated with all lost pay and benefits. From this decision, the NOPD appealed to this court.
The NOPD employed Mendoza for over thirty years when it terminated his employment. Mendoza worked as a police captain during the last five years of his employment. Prior to his promotion, Mendoza worked as a lieutenant. In his supervisory positions, Mendoza worked in specialized units as opposed to working in police districts; these specialized units included the Special Investigations Unit, Special Operations Unit, and the Traffic Division. The NOPD transferred Mendoza from commander of the Special Operations Unit to the Traffic Division in mid-August 2005.
The Traffic Division manages the day-to-day operations of the traffic controls throughout the city of New Orleans. The division includes a traffic enforcement section, permits and special events section, accident investigation unit, DWI unit, and fatality unit.
At the time of his termination, Mendoza reported directly to Assistant Superintendent Steven Nicholas ("Asst. Supt. Nicholas"), the Chief of Operations for the NOPD. Mendoza's second in command during the day was Lieutenant Henry Dean, and his night commander was Lieutenant Mike Cahn. The division's daytime administrative staff consisted of Sergeants Joe Valiente, Danny Mack, and Tony Caprera were primarily involved in the day-to-day administrative functions that included issuing parade and special events permits, traffic support for civic events, and VIP visits. Sergeant Donovan Livacarri supervised the fatality unit, Sergeant Raymond Genovese supervised the DWI unit, and three sergeants supervised the motorcycle units.
Edwin Compass was the Chief of Operations when Mendoza became a captain. Compass became the Superintendent of Police a short time later, and served until November 2005. Superintendent Compass transferred Mendoza to the Traffic Division approximately two weeks before Hurricane Katrina. Superintendent Warren Riley ("Supt. Riley") succeeded Superintendent Compass.
Supt. Riley received an anonymous letter dated 18 March 2006, accusing Mendoza of never coming to work and other acts of misconduct. Approximately two weeks later, Supt. Riley contacted Assistant Superintendent Marlon Defillo, the Commander of the Public Integrity Bureau, and directed him to "look into it." On 3 April 2006, Assistant Superintendent Defillo instructed Lieutenant Bruce Adams to investigate the anonymous complaint. Between 4 and 24 April 2006, the Public Integrity Bureau ("PIB") conducted a surveillance of Mendoza's activities. Sergeant *1158 Michael Harrison carried out the surveillance, and his surveillance log was made part of the record in lieu of his testimony. The parties stipulated that the surveillance log accurately reported Mendoza's physical presence during the periods of surveillance. Sergeant Harrison watched Mendoza during what he determined to be his "working hours," based on the time periods Mendoza entered into the payroll system. The surveillance generally ended an hour or two after the end of the time period reflected in the payroll system because captains work flexible hours. In fact, captains are responsible for their commands twenty-four hours a day, seven days a week. Even so, Sergeant Harrison did not watch Mendoza twenty-four hours a day or on weekends to determine how many hours he worked during a twenty-four hour period.
The disciplinary letter charged Mendoza with failure to devote the entire time to duty on seven of the fifteen days he was watched.[1] On the days where a violation was found, Mendoza's working hours began at 1:00 p.m. and ended at 9: 00 p.m.; Mendoza shifted his reported working hours to accommodate a morning detail he worked three days a week. The surveillance log gave Mendoza credit for working when he was physically at his office, or involved in what was determined to be police activities. During the seven days at issue, the surveillance log reflected significantly less than eight hours a day where Mendoza was physically in his office, or involved in police activities during his "working hours."
Supt. Riley testified that he demoted Mendoza to lieutenant and terminated his employment because he failed to show up for work. The surveillance log reflected that Mendoza was attending to non-police/personal affairs during working hours, often in Jefferson Parish. According to Supt. Riley, communicating via e-mails, telephone calls, and Blackberry could not substitute for actual physical presence on the job.
Supt. Riley testified that his decision to terminate Mendoza was based solely on the surveillance and not on any previous acts of misconduct. He acknowledged that Mendoza was responsible for a twenty-four hour, seven day a week operation. Supt. Riley confirmed that Mendoza was an exempt employee who was not required to report the use of annual or sick leave for any period of less than one day. He did not find that Mendoza neglected his duty. According to Supt. Riley, everything expected of the Traffic Division was getting done and the division was running smoothly. He did not confer with Mendoza's immediate supervisor, Asst. Supt. Nicholas, before taking disciplinary action; the investigation was conducted in secret without Asst. Supt. Nicholas' knowledge.
Asst. Supt. Nicholas testified that he was the Chief of Operations and Mendoza's immediate supervisor at the time of the surveillance. He was neither shown the surveillance log nor consulted during the investigation. In fact, he was not aware of the investigation until it was over. Asst. Supt. Nicholas stated that Mendoza should have spent more time at the office and been more visible. Had he known of the situation, he would have counseled Mendoza and instructed him to spend more time at the office.
Asst. Supt. Nicholas confirmed that police captains are expected to respond when needed twenty-four hour a day, seven days *1159 a week. According to him, commanders are required to notify him when they are not available for work; those who can be contacted by telephone are considered available. Asst. Supt. Nicholas testified that Mendoza was never unavailable and always responsive to his calls. He always handled his assignments and placed himself on furlough when not available. During Mendoza's command, the traffic division was operating properly and Asst. Supt. Nicholas had no complaints prior to the termination.
Mendoza was an exempt employee ("EAP") not entitled to overtime. According to Mendoza, the daily work schedule of an EAP employee is entered into the electronic payroll database only to enable the employee's accurate and timely compensation. It neither reflected the hours that he worked nor was relevant for purposes of determining whether he was devoting his time to his duty. He further testified that his devotion to duty could only be measured by his performance and not by a mechanical formula that could be applicable to a nonexempt employee who worked set hours with clearly defined daily functions.
Mendoza testified that captains do not work strict eight-hour days. He stated that he performed his duties, as trained by his supervisors, and consistent with Civil Service Memorandum No. 413.[2] When he held the rank of lieutenant, he was a non-exempt employee who worked an eight-hour shift. His superiors worked twenty-four hour commands. When Mendoza received his promotion to captain, he delegated duties to his lieutenants as his captains had done when he held the rank of lieutenant.
During his career, Mendoza always worked in specialized units as opposed to in a district. After becoming captain, he spoke to then Superintendent Compass regarding the additional compensation received by district commanders that commanders of specialized units did not receive. Superintendent Compass told him that as an EAP employee, he was not bound to a set schedule but was required to work the hours necessary to get the job done. Superintendent Compass never told him to be accountable for a designated eight-hour tour of duty.
Mendoza testified that Supt. Riley, after succeeding Superintendent Compass, never made any verbal or written announcements changing previous policies on how EAP employees performed their duties or reported their working time. When Asst. Supt. Nicholas became Supt. Riley's Chief of Operations, Mendoza operated with the understanding that he was required to be available to him twenty-four hours a day. If he was not available, he was required to take furlough.[3] Mendoza testified that no one ever informed him that the hours put in the computer payroll system had anything to do with the hours he was supposed to work.[4]
Mendoza testified that he normally worked more than eight hours during a twenty-four hour period, but not always consecutively. During the investigation, he was particularly concerned that the surveillance did not include nights and weekends. He also stated that he was extremely *1160 busy during the days in late March and early April just before the investigation commenced.[5]
Mendoza also testified that his attention shifted from the day watch to the night watch during the surveillance period to focus on implementing new procedures in the DWI Unit.[6] He stated that no compelling issues required his attention during the days. Further, his night supervisor, Lieutenant Cahn, was transferred during the surveillance period, causing Mendoza to focus more on nighttime activities because his daytime supervisor had matters well in hand.[7]
Mendoza went into his office on a regular basis to meet with his lieutenants and sergeants. He checked his inbox and reviewed paperwork late at night. He also saw Sergeant Genovese, commander of the DWI Unit, on numerous occasions. Mendoza also testified that he was available on weekends, and responded to at least one fatality on 9 April 2006.[8] Mendoza stated that he used his personal telephone, Blackberry, text messages, and e-mails to maintain contact with his superiors and subordinates.[9]
Edwin Compass was Superintendent of Police for three years, beginning in May 2002 and ending in September 2005. He was the Chief of Operations from November 2001 to May 2002, and a captain from May 1997 until November 2001. Superintendent Compass also confirmed Mendoza's testimony regarding their conversation concerning the flexible hours of an EAP employee.
Captain Craig Jennings was a captain since 1989; he confirmed that as an EAP employee, he was not responsible for entering annual leave or sick leave for periods of less than a day. He also stated that he was not held to the hours of work entered into the payroll system, but was responsible for his command twenty-four hours a day. He had never been informed that his practice was contrary to internal regulations. He took leave when he was not available by telephone, e-mail, or otherwise. He was also present during the conversation between Superintendent Compass and Mendoza. He never received notice of any policy change when Supt. Riley took charge. According to Captain Jennings, captains adjust their schedules to conform to what is in front of them.
Captain Jeffrey Winn testified that he had never been held to an eight-hour day. He was expected to get the job done whether it took two hours or eight hours; the bureau chief dictated the expectations of the job. If a deficiency existed, his bureau chief would let him know.
Sergeant Joe Valiente had been a sergeant in the Traffic Division since 1999. He works the day shift processing parade *1161 and special events permits. He testified that Mendoza was always available and responsive in a timely manner. Sergeant Valiente confirmed the amount of work involved in preparation for the Rainbow Push Coalition.
Sergeant Raymond Genovese was assigned to the DWI Unit, and worked nights. He testified that he often saw Mendoza at night. He also noticed an increase in his presence on the night watch after Lieutenant Cahn was transferred. Sergeant Genovese testified that Mendoza was always available. They generally communicated verbally, or occasionally by telephone.
Sergeant Danny Mack worked in the traffic division for most of his forty years on the job. He was assigned to create an evacuation plan by Mendoza, who reviewed the plan, and discussed it with him. Sergeant Mack planed VIP visits from a traffic standpoint that he discussed with Mendoza, who was always available. Sergeant Mack confirmed that the number of VIP visits increased significantly since, and because of, Hurricane Katrina.
The hearing examiner found that the NOPD established that on the seven days in question, Mendoza worked less than eight hours during the hours entered into the payroll system. If Mendoza were a non-exempt employee with set hours and measurable functions, the NOPD's evidence would have been sufficient to show that Mendoza failed to devote his entire time to duty. However, the hearing examiner found that the internal investigation was flawed from the beginning. Mendoza did not work set hours; he was responsible for his command twenty-four hours a day, seven days a week. In addition, captains were not anchored to a single physical location to allow for the performance of their duties.
The hearing examiner found that the internal investigation was also flawed by the NOPD's failure to investigate Mendoza's job performance. The report states:
Asst. Supt. Nicholas was the Appellant's supervisor, and in the best posture to know whether he was working. He would also be in the best posture to know whether the Appellant's devotion to duty was an ongoing problem. It seems incongruous that time and resources would be devote to a secret investigation of a high ranking long term employee with a proven track record based upon an anonymous letter without first consulting the target's immediate supervisor to determine whether the allegation had any merit, and to enlist the immediate supervisor's assistance in the investigation if in fact it did. Clearly, devotion to duty can best be measured by job performance and not by a mechanical formula that may be applicable to a nonexempt employee who works set hours with clearly defined daily functions.
In this particular matter, the Appointing Authority acted arbitrarily. He [Superintendent Riley] relied upon flawed and incomplete information. He failed to rely upon his chain of command. He failed to take into consideration the payroll policies of the New Orleans Police Department. Supt. Riley was his predecessor's Chief of Operations. As such, he knew or should have known Supt. Compass's policy regarding EAP employees. Clearly, Supt. Riley has the authority change policy. However, he must give his subordinates notice of his changes, and certainly cannot discipline them without first doing so.
In summary, if the Appointing Authority wanted the Appellant to spend more time at the office and on the streets, he should have told him, and allowed him to conform to his policy.

*1162 The Appointing Authority has failed to establish by a preponderance of evidence that it terminated and demoted the Appellant for cause. As such, the appeal is GRANTED.
The CSC reviewed the hearing examiner's report, the transcripts of the hearing, and all documentary evidence. After its review, the CSC agreed with the hearing examiner's finding that the "scope of the surveillance and the basis for the discipline were `flawed from the beginning.'"
The CSC found Mendoza's defense persuasive. Mendoza called several witnesses to show that he and the other captains have never been required to keep regular office hours or put in eight continuous hours of police work each day. In addition, the witnesses called by him demonstrated that his performance and availability as manager of the Traffic Division was satisfactory. In particular, the CSC relied on the testimony of Captains Norvel Orazio (Chief of Staff of NOPD's Administrative Staff Bureau and a thirty-three year veteran), Craig Jennings (former commander of the First Division and several other divisions and a thirty-eight year veteran), and Jeffrey Winn (commander of the Tactical Division) to support Mendoza's testimony, summarized by the CSC as follows:
Appellant testified that he and other Captains do not routinely work eight hour days at their respective offices. They must be available for duty at all times. His devotion to his job is evaluated by the overall performance of the Traffic Division and not by totaling up hours. Nevertheless, he felt that he averaged more than eight hours a day but not consecutively. For example, he personally responded to all traffic fatalities whenever they occurred-night or day.
He pointed out that he maintains an office in his apartment at the American Can Company and frequently handles police work at that location. Furthermore, with the departure of Lieutenant Cahn as Supervisor of the night shift at the Traffic Division, Appellant had stepped up his visits to the office at night to make sure things were operating smoothly.
He also testified to frequently working on weekends and utilizing his cell phone and blackberry for police related work.
In sum, though Appellant did not account through his testimony for spending at least eight hours a day on his duties on the seven days in question, he did show that the surveillance conducted of him did not accurately total up the time he actually devoted to police work.
In its conclusion, the CSC stated:
It is arguable that there could have been better communication between Appellant and his rank as to what was expected of him in terms of presence at his office. But we do not think that the severe penalty of termination of an officer with a lengthy and successful career with the police department was the way to handle the situation.
The evidence in the record supports a conclusion that Appellant, as a Captain with exempt status, should not be subjected to termination based solely on a failure to devote eight continuous hours to police work each day. In evaluating the work of a Captain the number of hours logged on the job on a daily basis is but one factor to be considered and usually comes into play when there is a decline in the overall performance of the Division under his command.
There has been no evidence offered in this proceeding that Appellant failed to devote to his job the time, attention, and skill necessary to manage the Traffic *1163 Division effectively. Not one witness testified that Appellant's supervision of the Traffic Division was unsatisfactory or that he was not available. To the contrary, everyone, including the Superintendent, has given him good marks for his job performance.
It bears emphasis that the Superintendent has the authority to require that all of the officers within the NOPD (regardless of rank) meet the highest level of performance. If the Superintendent suspects that a Captain is taking advantage of the flexibility permitted by his exempt status by taking too much personal time off, then the fair solution to the problem is to give notice and an opportunity to correct the problem.
The appeal was granted with an order that Mendoza be reinstated with all lost pay and benefits.
An employee who has gained permanent status in the classified city civil service cannot be subjected to disciplinary action by his employer except for cause expressed in writing. The employee may appeal from such disciplinary action to the CSC. The burden of proof on appeal, as to the facts, shall be on the appointing authority. La. Const. art. X, § 8 (1974); Walters v. Department of Police of New Orleans, 454 So.2d 106, 112-113 (La.1984). The CSC's decision is subject to review on any question of law or fact upon appeal to the appropriate court of appeal. La. Const. art. X, § 12(B).
The CSC "has a duty to independently decide from the facts presented whether the appointing authority had good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed was commensurate with the dereliction." Walters, 454 So.2d at 113. "Legal cause for disciplinary action exists whenever an employee's conduct impairs the efficiency of the public service in which that employee is engaged." Cittadino v. Department of Police, 558 So.2d 1311, 1315 (La.App. 4 Cir.1990). The appointing authority has the burden of proving, by a preponderance of the evidence, that the complained of activity occurred, and that such activity bore a real and substantial relationship to the efficient operation of the public service. Id.
In reviewing the CSC's exercise of its "discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction," this court should not modify the CSC's "order unless it is arbitrary, capricious, or characterized by an abuse of discretion." Walters, 454 So.2d at 114. "Arbitrary or capricious" means that no rational basis exists for the action taken by the CSC. Bannister v. Department of Streets, 95-0404, p. 8 (La.1/16/96), 666 So.2d 641, 647.
The CSC "has the authority to `hear and decide' disciplinary cases, which includes the authority to modify (reduce) as well as to reverse or affirm a penalty." La. Const. art. X, § 12; Fihlman v. New Orleans Police Department, 00-2360, p. 5 (La.App. 4 Cir. 10/31/01), 797 So.2d 783, 787. The legal basis for any change in a disciplinary action can only be that sufficient cause for the action was not shown by the appointing authority. "The protection of civil service employees is only against firing (or other discipline) without cause." Id. "The superintendent of police is charged with the operation of his department and it is within his discretion to discipline an officer for sufficient cause." Id.
After reviewing the appellate record, we find that the NOPD failed to carry *1164 its burden of proof and demonstrate sufficient cause for the termination. In particular, no showing was made that the complained of activities by Mendoza bore a real and substantial relationship to the efficient operation of his command. No evidence exists that the Traffic Division operated deficiently. In fact, Supt. Riley did not find that Mendoza neglected his duty. According to Supt. Riley, everything expected of the Traffic Division was getting done, and the division was running smoothly. Without such a showing, no legal cause exists for disciplinary action. Cittadino, supra at 1315.
Based on the forgoing, the decision of the CSC is affirmed.
AFFIRMED.
ARMSTRONG, C.J., concurs in the result.
I respectfully concur in the result reached by the majority.
NOTES
[1] The anonymous letter contained other allegations of misconduct. These were either determined to be without merit or resulted in additional grounds for discipline that were eliminated at the time of the hearing.
[2] In essence, Memorandum No. 413 informs exempt employees that they are not required to apply for or take sick or annual leave for periods of less than one day.
[3] Mendoza presented evidence that he in fact took furlough during the surveillance period when he had personal business that would make him unavailable.
[4] In order for the payroll system to lock and issue checks, all employees, including EAP employees, had to report an eight-hour shift regardless of hours worked.
[5] Mendoza testified regarding the Rainbow Coalition Rally, and VIP visits by the First Lady and the president of Ecuador.
[6] Mendoza presented evidence that he discussed implementing a proactive DWI unit with Asst. Supt. Nicholas, which was approved. He also presented statistical evidence demonstrating an increase in DWI arrests as a consequence.
[7] Mendoza raised the issue of Lieutenant Cahn's transfer with his supervisor and was instructed to make necessary adjustments. Mendoza chose to work more nights.
[8] Mendoza testified that he responded to all fatalities. He was far more visible in the daytime during the weeks preceding the surveillance (i.e., Rainbow Push). Because of the reduction in daytime responsibility, Mendoza was able to work more daytime details.
[9] Mendoza's records reflect sporadic telephone calls during all periods of the day and night.